Your Honor, the general standard, as I'm sure you're aware from Graham, is an objectively reasonable one, and the test is whether the severity of the crime at issue poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting or attempting to evade arrest by flight. Essentially, Your Honor, the court below, I believe, used the wrong standard. I think they were looking at whether in fact there was evidence of whether these things actually occurred, not whether a reasonable officer could believe that these standards are met. And that's where the big problem with the judge below was. You, ladies and gentlemen, get to look at these facts yourselves, and I think the briefs put them out very well, but just a couple of points that I'd like to emphasize. Let me just focus it a little bit, kind of keying off what you said. It seems to me that the law is fairly well established that you can't use deadly force unless there's a significant threat of death or serious bodily injury to the officer or to others in the vicinity. Yes, Your Honor. That, as a general proposition, has been the voice for a long time. So what was, can you articulate any threat to the officers at the time that they shot this individual? Yes, Your Honor, and very easily. If you look at the cases that the Brousseau court looked at, those No, I don't want to look at cases. I want to look at the facts. And I'll get to those.  The threat to the officers was that this man, through his course of dealing with his vehicle, had clearly established that he was willing, that the vehicle had become a dangerous, a deadly weapon, and that he had the mental framework, frame of mind, to use it as a deadly weapon, and had done so on numerous occasions. His intent was also made clear by his disobeying orders, by his slashing a knife at people, by his running Well, he would have stopped there. That might have been true when he was careening down the highway. But now he's got, you know, the video was furnished to the court. You have this person who, there on notice, has kind of been a suicide watch situation. His truck is hemmed in by like six police cars and dozens of police officers. What's the threat of the vehicle being used as a deadly weapon at that stage? Your Honor, it went backwards at a very high rate of speed. Now, remember, we are looking at this from the officer, point of view of the officer on the scene. It went backwards after he was shot with the taser? That is correct. And if we were here judging the liability of the officer who shot the taser Could that vehicle have left the scene when it was hemmed in by six police cars? Again, it's the reasonable person's standard. And the question is, could the officer... Answer my question and then you can make... So, yes, that vehicle could have left the scene reasonably, even though it was hemmed in by six police cars. Because it wasn't hemmed in by six police cars. There was one car to the south, and it was back behind it with a very large embankment, the full width of a lane that's clearly visible on the tape. And that's indisputable evidence. So that car could have gone forward without question around to either bank to the south. So then you could shoot somebody rather than, for example, putting another police car there or taking some other action. Your Honor, ideally, what would have happened ahead of time is the officers would have done a better job of boxing him in. But the fact is that they didn't. And it was clearly apparent to the officers who fired that he hadn't been boxed in. So, yes, there was a definite risk of getting outside this area of containment, plus the history of what had happened before. Once he's outside that area of containment, this person has already demonstrated his capacity and his intent to take people down with him, first in backing up with an officer right behind him, second in the whole history leading up to it. And now you're at rush hour with a lot of curious people outside their vehicles. And you've got a very dangerous situation. The pit stop itself had demonstrated how dangerous that was. And once he has been able to pull forward, the opportunity is gone. And now we can say maybe we should have in retrospect, but we're talking about an officer on the scene making a snap judgment. When he's got to decide these issues. And this person, once he is outside of containment, you can shoot at him, but there have been already, what, 24 rounds at this vehicle? None of them had stopped the vehicle. One of them directed right at him and it ricocheted off. So then you also, with all these people around, now are creating a huge risk if you're going to be using a weapon with this person. Like in the Cole case, the officers waited until there was nobody around. Well, at that moment, he's not presenting a threat to anybody. But these cases look at the history and the fact that this person has demonstrated an immediacy of a history of threat. The question is that the vehicle is what remained the threat at the time he was fired on. There's no question that in addition to the vehicle, this person, and one of the cases talked about that, had the capacity to potentially stop, get out of his vehicle, and was armed with a knife. Plus, these officers went into the impression, because shots were fired, that he was armed with a weapon. As the cases point out, the fact that they were with a gun. Was there any evidence that he had anything other than a little folding knife? Yes, they had the shots fired on multiple occasions. That was the evidence they had. From that, they had the assumption that there was a real possibility this person was armed and had actually been shooting at officers. Again, the possibility of him leaving the vehicle, even with a knife, is there to take hostages. The potential was there with people out in the streets. But again, the vehicle itself had been clearly indicated or used as a deadly weapon, an attempted deadly weapon in this case, on multiple occasions. So the immediacy aspect of this, Your Honor, is somewhat of a relative term under the cases. If a person had just stolen an elderly lady's purse and we had no other history, then we might have a different situation. But the cases clearly make that distinction. Cole, Pace, Freeland. But when you've got a history of somebody who's shown their capacity, then it isn't just the, is this person, I mean, split second away, I mean, virtually dead before you're allowed to shoot. No, this person has shown that he is going to continue his attempt to escape. He is going to continue to jeopardize people. So that's the situation we're facing here, Your Honor. I see my time is just about up.  Yes, please. May it please the Court. Jeffrey Dickerson on behalf of the appellee, Candace Lehman, who is the widow of Josh Lehman. Your Honors, the focus should be upon the scene of the accident because these officers, as counsel stated, there is evidence that they heard over the radio that shots were fired, but both officers testified that by the time they made the decision to shoot, they knew that he was unarmed. They knew that. Unarmed meaning not a pistol. Not a gun, right. And I don't consider the knife to be a weapon under the circumstances. I mean, he'd come out of the car before, but these officers were not involved in that situation where they could have gone hand-to-hand with him. In fact, they were at a distance away until, of course, Tie Guard came up and shot him in the chest at point-blank range. So what we have is a situation. These two officers had been there for a while, and they'd observed. Tie Guard from two different positions and Robinson from another position in the front had observed the negotiators working with Josh. And observed that the taser guys come in and shoot their tasers at Josh. And so they knew this was going on. They knew that these people over there had control of the situation. They knew that the officers in command were over there. The negotiators were the officers in command. The negotiators were making the decisions and the calls on what to do. They're the ones who called in the tasers. These arena police officers arrived later onto this scene, and counsel supplemented the record with Adams v. Spears, a Ninth Circuit case. I'm sure you're aware of that. And it's a recent case. And that case supports our position, because there, the officer engaged him. There was a pursuit going on that the officers already had control of and were already executing the plan that they had developed. And this other renegade officer intervened into the pursuit. And that's what these officers did on the scene. They came onto the scene and barged in with their long rifles. They're the SWAT guys from Reno. And they wanted to be cowboys. You're drawing a lot of inferences from someplace that I didn't read in the record. A, they're cowboys. B, they're SWAT guys from Reno. C, they were not involved with us, the police officers. I've read the record. I've looked at the video. Is there something that you know I don't know? Well, maybe I do know those things, Your Honor, but they're not in the record. You're correct. Let me talk about things that are in the record then. Let's do that. All right. As I was saying, the situation is contained. The officers know that there's a negotiation going on. The tasers are applied, and they know that there's a reaction of a reversal of the truck into a piece of property. Robinson cannot identify anybody who's behind the vehicle in danger. That's accepting the facts in a light most favorable to the appellee in this case, which this Court should do. That fact is that there was nobody in Robinson's mind in danger behind that. The best thing he gets is that he saw somebody jump out from behind the truck, which indicates that there's nobody behind the truck anymore at the time he decides to shoot. Tygaard's situation is he has a point of vantage at the back of the truck. He sees the truck back up. It's right next to him and hit the NHP vehicle. So he knows there's nobody there. He proceeds forward to make his move at that point. I heard the shots, and it appeared to me that they took place before the vehicle behind was struck, that it was almost immediate when the car started, the shots went off. That's before us. The car went back at an amazing speed. I read the briefs that the car couldn't go very fast. I saw the tape, and it was amazing how quick that car shot back. I observed what it did to a very large vehicle behind of actually turning it around. And so it seems to me that something happened very rapidly, car going back quickly, shots fired before it even hits the car behind. And the video also indicates that there was a way out. As I looked at the video, there was a place where there were not vehicles. So maybe you can help me. What is this that the car was completely contained, was able to knock around a very large vehicle? There was an area it could get away, but the district court found that it was completely contained. Well, I think the district court found that the truck was contained or at least difficult to move. That's the wording of the district court. Yeah. After that, say the shooting hadn't happened, as the vehicle hit and knocked that issue aside, I don't know the condition of the car at that time, but there is an area that it could have driven out of. Clearly, they had a lot of officers around. So I didn't understand what he meant by contained. He said there was a car behind, a car to the side, and a motorcycle to the side. And the motorcycle is up near the front of the truck. So it would have been out of the containment once it hit the SUV. I take it the district court did look at this video. Yes. And that's before us as part of the record. Yes, it is. So the issue is in this very split second when the car is going to shoot back and the firing takes place before it hits the car, in that little window of time did these officers act reasonably? That's what we have before us, I take it. Well, you've got some conflicting evidence here. And Adams v. Spears tells us that the facts viewed most favorably to the plaintiff have to be accepted as undisputed. Right. It's summary judgment. Right. We've got Drew Elani, who's the NHP officer who did the pit maneuver, who was one of the negotiators. He's standing right there. He testified that there was no way out. Now, granted, the video shows what it shows, but that's testimony. Yes. And Sloab, who was the second officer on the scene, he was rammed down the road and he came up and he was the second responder along with Stahl, who was the motorcycle guy, and Clyer, who was in another car. The NHP vehicle is behind. Clyer's car is right to the left of Josh's vehicle. The motorcycle is over here, and back here is Sloab's car. So if there's a path, it's going to be up to the north, as you can see on the videotape. In other words, the camera is north of the scene. Yeah, yeah. So it's going to come this way. Right. And so we've got testimony that back here there are two sheriff's rigs parked on the shoulder over there, that all the people up by Cheyenne, the next street, had been moved out by McMillan, and the Tie Guard had advantage of that to see that those people were being evacuated from his vantage point. So we have this area over here being taken care of. In addition, we know that Robinson was right in the path of that vehicle to go that way when he shot, and the vehicle was not coming towards him, it was going away from him. So in terms of your question is about containment, and that answers the question as to my understanding of the vehicles. Giurilani's testimony that the vehicle could not go forward with any success because of the way the shoulder was designed right in front of the car or the truck, that there was a ditch and then a cyclone fence. And beyond the cyclone fence, this isn't in the record so I won't mention it, but beyond the cyclone fence, there's something there for the jury to hear. And the other testimony is Slope, who was second on scene and had great vantage points, and he testified the only way for that vehicle to go is backwards. So we have that evidence also. Now, I know that I see. And also is there a factual dispute as to whether the backing up was the result of the Taser shooting or whether it was an affirmative act on his part? Well, we have a factual dispute there, I guess. The question right now, though, is what was in the officers' minds. Right. And Tigard testified that he saw the Taser applied, saw Josh react to it, saw him bend down and grab the shifter and put it into reverse. McGee is the guy who applied the Tasers. He's standing right there at the door, and he was asked what he saw in terms of Josh doing anything, and Josh was convulsing. And the other officer, who was Bruton, he testified to the same thing. 50,000 volts times two were going through Josh. And as McGee said, he's had that happen to him. Every one of these officers he uses a Taser has to get Tasered. And he said, it feels like they're ripping the flesh and muscle off of your bones. So it's kind of hard to engage in a conscious thought process of, you know, survival, evasion, and escape. I'll put it into reverse, and I'll go back. But all this is not for us to determine. The question is what was in Tigard's mind, and he said he saw him reverse. But how could that be if the two guys right there are looking at him and say he didn't do anything with the car? He just was convulsing. The question is what's reasonable, and then the question is, of course, in some cases, there's facts that depend on how you take them. It's whether or not something is reasonable. I mean, that's where you get unqualified immunity. I guess my point there is that you should construe the McGee-Bruton evidence in our favor to reach the conclusion that. That it was unreasonable at that point? Yeah. No, that this guy did not see him put it in reverse. Let me ask you another question. That has to do with the police behind the car. Yes. What does the record show in that regard? When I looked at the video, it looked like the two shooters were right in the front of the car. And I wondered what their access was, what their view was of what was behind the truck. Permission to answer? If my time is up, Your Honor. Yes, please. Yes. The testimony of the officers, I think, all around, establishes that Tigard was at the left rear of the truck, right next to the NHP vehicle. That was his vantage point. Oh. And he had his rifle on him. Excuse me. He had his rifle on him. He had his rifle with his feet on him, as he said, on the back of the truck. He was at the back of the truck. Yes. And then the truck reversed and hit right next to him. And then he moved forward. He made the decision at that point to move forward with his rifle, moved up to the driver's side, put his gun inside, and took three shots. Now, it looked like that there was a shooter in front of the truck. That's Robinson. Okay. And he was a shooter. He was a shooter. And what was his view of what was behind the truck? His view is we have different stories about what his view was. He tries to justify it in litigation that he thought people were back there, but his contemporaneous statement was that he could not identify anybody that was back there. Tygaard is right there when it happens. He said there was nobody back there. Tygaard's justification is the escape idea. Robinson's justification is people behind the vehicle. And was there testimony from other officers as to their perception of the situation and whether a shooting was required or at least reasonable? Well, there was, Your Honor. And I think, you know, Scott Stahl was the Washoe County Sheriff's deputy who had the motorcycle and was in command of the scene because he was the chief negotiator. And Girlani was the one who did the pit maneuver. He's an NHP trooper. Both great officers, and they were, by all accounts, successful in this negotiation process. And both of those officers testified that they would not have taken a shot. In fact, Stahl testified that what he was in the process of doing was moving forward to try to assess the situation. You know, what's Josh doing here? I thought I had control of you, Josh. Moving forward to assess the situation. And he had his gun at the ready, but he had no intent to use it at that point in time. The same point in time when Tygaard comes up and moves in front of him to take the shot. Thank you. Thank you.  Thank you, Your Honor. A couple of points. One of the things that we're looking at is a couple of justifications. One is the things you're looking at right now. What was that going on immediately behind him? Tygaard was in a position to be aware that there were officers behind because he was moving from that location to the side so that he wouldn't, when he shot, hit anybody else. The other officer was in front. Robinson was in front. And when the vehicle was going back, he saw an officer dive out. He didn't know if there were others but thought there might be others back there. As you've correctly pointed out, it was virtually instantaneous. By the time he makes his decision, he needs to fire and brings up his weapon. There's a split second, but that's all that exists on that tape. So there is that immediacy to the threat. There is also the immediacy in the sense of here is an officer that I talked about before with a number of things going on, and what these officers both see, these defendants, is this officer, the taser. A taser circulates for five seconds. So, yes, he is going like this. Then he makes volitional movements, and these officers have seen him looking around, and you can see the officers behind him. He knows that on the video, and unfortunately, thinking he's doing a good job, he focuses real tight. But the officers say they have seen Lehman looking around behind him at the officers, and he's aware they're there when he reaches down to the best of their understanding and puts it in gear and goes backward. It's undisputed. He goes backward at full speed. And that's with the appearance to a reasonable officer that he is trying to hit those officers back there, again confirming whether that officer has dived out. Again, one of the cases points out that I've cited that there was no cooling off period, no time for reflection here. It was an instant reflex. But that just further points out that this person is in the act of attempting to escape, and if he does escape, you have so many targets out there. Here's where Brousseau v. Haugen is real important because, yes, there were only two vehicles. One is four feet away with people inside. One is 30 feet away, 20, 30 feet away with people inside. Officers not even viewed just the idea that they might be out there, and the court felt that that was sufficient threat to justify shooting as he drove away. So the idea, well, I think I've made that point. Thank you very much. Thank you very much. Thank both counsel for argument this morning. The case of Lehman v. Robinson is submitted.
judges: Wallace, Cudahy, McKeown